AO 91 (Rev. 11/11)  Criminal Complaint                                                                    AUSA GLENN-APPLEGATE

# UNITED STATES DISTRICT COURT
### for the
### Southern District of Ohio

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No.  2:25-mj-610 |
| SATHTHIA G. LINGAN | ) | |
| | ) | |
| | ) | |
| | ) | |
| _____ | ) | |
| Defendant(s) | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___2020 through the present___ in the county of _____Franklin_____ in the
___Southern___ District of _____Ohio_____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1349 | Conspiracy to Commit Wire Fraud |
| 18 U.S.C. § 1956(h) | Conspiracy to Commit Money Laundering |

This criminal complaint is based on these facts:

See attached Affidavit.

☑ Continued on the attached sheet.

Kyle M. Borton  Digitally signed by Kyle M. Borton
Date: 2025.10.29 14:27:21 -04'00'

_____
*Complainant's signature*

Kyle Borton, IRS-CI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.
Via Telephone

Date: ___October 30, 2025___

City and state: ___Newark, Ohio___

_____
Elizabeth A. Preston Deavers
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

## AFFIDAVIT
### IN SUPPORT OF CRIMINAL COMPLAINT

I, Kyle Borton, Special Agent, U.S. Department of the Treasury, Internal Revenue Service, Criminal Investigation, being duly sworn, depose and say that:

## Introduction and Purpose

1. I am a Special Agent with IRS-Criminal Investigation and have been so employed since 2020. I have received specialized law enforcement training at the Federal Law Enforcement Training Center, Glynco, Georgia and additional specialized training from the IRS. My duties as a Special Agent include conducting investigations of individuals and businesses that have violated Federal Law, particularly those laws found under Title 18, Title 26 and Title 31 of the United States Code. I have participated in multiple such investigations, including but not limited to, investigations of persons or organizations involving tax evasion, wire fraud, identity theft, and money laundering. I have consulted with senior agents in my office regarding this affidavit who have investigative experience regarding the specific violations outlined herein.

2. In 2023, IRS-Criminal Investigation initiated an investigation on SATHTHIA LINGAN (LINGAN), _____ _____ ( _____ and other co-conspirators. Based upon the facts presented in this Affidavit and my experience, there is probable cause to believe LINGAN and _____ engaged in a wire fraud conspiracy in violation of 18 U.S.C. § 1349 and a money laundering conspiracy to launder the proceeds of wire fraud, in violation of 18 U.S.C. § 1956(h). A significant amount of the acts to carry out this conspiracy occurred in the Southern District of Ohio.

3. As a result of your affiant's personal participation in this investigation, as well as information provided to your affiant by other federal and state law enforcement officers, I am familiar with the information submitted in this Affidavit. This Affidavit is being submitted for the limited purpose of requesting the issuance of a Criminal Complaint and Arrest Warrant for SATHTHIA LINGAN for violations of 18 U.S.C. § 1349, and 18 U.S.C. § 1956(h). Accordingly, I have not included each and every fact known to me concerning this investigation. Where this Affidavit uses an anonymizing identifier, such as Person A or Ohio Victim 1, the true identity of the person is known to me.

## Background

4. Your affiant believes the evidence garnered so far in this investigation tends to show LINGAN, _____ and other co-conspirators are operating an investment scheme, where new investors' funds are used to pay prior investors (consistent with Ponzi scheme). LINGAN, _____ and other co-conspirators created a money laundering network to move the proceeds from their Ponzi scheme. LINGAN,

[REDACTED] and other co-conspirators have created numerous entities that operate solely to deceive investors and make it appear as if investor funds are being used for a true business/investment purpose. These entities have multiple bank accounts across numerous financial institutions. LINGAN's name is normally not associated with the entities or bank accounts, and other co-conspirators create these entities and open the corresponding bank accounts at LINGAN's direction.

5. Investors believe they are investing into some kind of automobile opportunity. One investment pitch is centered around wholesale opportunities, where LINGAN or [REDACTED] tell investors they would use investor funds to purchase a group of vehicles, and sell those vehicles at a profit. LINGAN and [REDACTED] tell investors they leverage their relationships in the automobile industry to get access to these vehicles at a discount. Investors are told every deal already has another buyer lined up who has agreed to purchase these vehicles at a profit. In most instances these wholesale opportunities did not exist, vehicles were not being purchased, and investor funds were being used to pay other investors and fund LINGAN's, [REDACTED] and other co-conspirators' lifestyles.

6. Another investment pitch was centered around exotic vehicles. LINGAN, [REDACTED] and other co-conspirators would tell investors that they would use their funds to purchase exotic vehicles (Lamborghinis, Ferraris, etc.). These exotic vehicles would either be flipped at a profit or enter into a rental fleet, where they would be leased to customers. Profits from either the sale or rental company would be split between the investors and LINGAN's or [REDACTED] entities. LINGAN, [REDACTED] and other co-conspirators had exotic rental companies set up where these exotic vehicles would be rented from. There were instances where investor funds were being provided to purchase vehicles that did not exist. There were also instances of exotic vehicles existing, but multiple investors provided funding for the same vehicle. Investor funds were being used to pay other investors and fund LINGAN's, [REDACTED] and other co-conspirators' lifestyles.

7. LINGAN, [REDACTED] and other co-conspirators made materially false statements to investors, impersonated other individuals on phone calls and emails with investors, and provided investors with fraudulent documents including but not limited to: fraudulent bill of sales, purchase orders, duplicate/fraudulent vehicle titles, and fake vehicle rental agreements. The false statements, impersonations, and fraudulent documents were all used to keep the scheme going by either inducing further investments, give investors the appearance that their funds were being used properly, and lull investors when investors demanded payment.

8. There are at least 50 investors located in at least the following states: Ohio, Florida, New Jersey, Virginia, and California. This affidavit represents a sample of victims and does not describe or represent all victims of these crimes.

9. Entities under LINGAN or [REDACTED] control collected over $50,000,000 from investors during the Ponzi scheme. This money was then entered into the money laundering network created by LINGAN, [REDACTED] and other co-conspirators. Many of the transactions are between entities in the network and appear to be the circular movement of funds, as a way to make it appear investor funds were being used for legitimate business purposes.

Since the individuals in control of these entities were working in concert with each other, the activity was in violation of 18 U.S.C. § 1956(h).

10. Your affiant and other investigators have reviewed at least 100 bank accounts associated with entities under LINGAN's or ▇▇▇▇▇▇▇▇ control that were used to carry out or further the investment fraud. Below are entities part of the money laundering network that have had bank accounts analyzed as a part of this investigation (Note this is not all the entities in this network):

| LUX AUTO DEPOT | AMERICAN ASSET GROUP | ALPERTA FINANCIAL |
|---|---|---|
| MAXXVIN | MAXXVIN CAPITAL | REIGN AUTO LEASING |
| OXFORD MOTORS | LA STALLA EXOTICS | STRADA EXOTICS |
| MIDWESTERN WHOLESALE | STAR WHOLESALE | ULTIMATE WHOLESALE |

## Evidence in Support of Probable Cause

### We Buy Cars America LLC

11. According to Ohio Secretary of State records We Buy Cars America LLC (WBCA) was incorporated on July 13, 2020. Person C is listed as the statutory agent for the corporation.

12. On September 23, 2025, IRS-CI interviewed Person C. According to Person C, he provided funding for LUX AUTO DEPOT (LUX) to purchase vehicles for LUX's surface lot. Person C and ▇▇▇▇▇▇▇▇▇▇ agreed to split profits 50/50. Shortly after providing this funding, ▇▇▇▇▇▇▇▇▇ introduced Person C to LINGAN. During this meeting LINGAN talked about his experience in the auto wholesaling business. In or around June 2020, Person C wanted to pursue wholesale opportunities with LINGAN and created WBCA as the entity to do this. Person C, his brother, and LINGAN were all equal partners in WBCA.

13. According to Person C, LINGAN's wholesale pitch was that LINGAN was able to find good deals on specific vehicles and buy them at a discount, using WBCA funds. LINGAN would then already have another buyer lined up who agreed to purchase the vehicles at a higher price. The profits were guaranteed and known before WBCA provided funding.

14. According to Person C, he was responsible for finding investors, collecting investors' funds, and maintaining investor relations. Person C used his prior relationships at the Dublin Entrepreneurial Center to find investors for WBCA. LINGAN was responsible for handling the wholesale deals, finding good vehicles to purchase, and lining up the next buyer.

15. According to Person C, WBCA needed to use LUX because WBCA did not have a dealer's license and a dealer's license was needed to carry out the wholesale deals. ▇▇▇▇▇▇▇▇ was disappointed to not be a partner in WBCA but still agreed to handle titles for WBCA. A LUX bank account, which Person C had access to, was used to receive funds from WBCA. Before money was sent to the end buyer, the money needed to go to a different

LUX account. LINGAN told Person C this was because auctions and other wholesalers had financial history with other LUX accounts. Person C understood the flow of WBCA / LUX money was as follows:

Investor → WBCA account → LUX account →     LUX account    → Seller (Auction)
(Person C Access)    (No Person C Access)

16. According to Person C, early WBCA deals were for specific vehicles, and LINGAN provided him VINs for those vehicles. Starting in 2022, WBCA started to pool investors' money and WBCA started buying larger batches of vehicles. WBCA promised to pay a flat rate to investors. LINGAN was responsible for maintaining the VINs of the vehicles WBCA was purchasing.

17. According to Person C, one of the wholesalers WBCA purchased from when WBCA started doing larger wholesale deals was MIDWESTERN WHOLESALE. Person C believed MIDWESTERN WHOLESALE was providing large amount of Dodge Rams at a discount for WBCA to purchase. Person C never spoke with anyone at MIDWESTERN WHOLESALE and LINGAN maintained the relationship with MIDWESTERN WHOLESALE. Your affiant believes MIDWESTERN WHOLESALE is part of the money laundering network set up by LINGAN and MIDWESTERN WHOLESALE is under LINGAN's control.

18. According to Person C, WBCA did a large deal to purchase wrecked cars from Hertz Rental Company at a significant discount. LINGAN told Person C that there were issues with WBCA getting titles for these vehicles so WBCA was unable to get paid from their buyer. From approximately August 2023 through the beginning of 2025, Person C communicated with two purported brokers from Hertz about the status of these titles. In or around September 2025, Person C spoke to an employee at LUX. That employee informed Person C that he/she was instructed by LINGAN to tell Person C that the Hertz titles were coming in, but the employee informed Person C that the titles were never received. Review of bank records also did not find any funds being sent from Lux or WBCA to Hertz or any entity known to be controlled by Hertz.

19. I interviewed Theresa Gabbard (Gabbard). According to Gabbard, Person C hired her to track the money received by and paid to WBCA investors. Gabbard's understanding of the business was that WBCA bought fleets of vehicles and sold them at a profit. WBCA used LUX to get the vehicles to the other dealerships that WBCA sold to. Gabbard had to interact with LINGAN to get interest percentages on WBCA loans (interest paid to investors) and what the profit margins were on deals. Gabbard would receive fleet details from LINGAN, if she requested it. Gabbard offered to track inventory for WBCA but she was told it did not make sense since LUX was responsible for holding WBCA inventory.

20. According to bank records, from at least June 1, 2021, through July 14, 2023, WBCA collected approximately $12.9M from at least 40 investors.

21. According to bank records WBCA transacted with the following entities your affiant believes are under LINGAN's control: REIGN AUTO LEASING LLC, STAR WHOLESALE, MIDWESTERN WHOLESALE, ULTIMATE WHOLESALE. MAXXVIN, and MAXXVIN CAPITAL.

**WBCA Victim 1**

22. WBCA Victim 1 was interviewed by IRS-CI. According to WBCA Victim 1, he/she was initially approached by Person C to invest in LUX. WBCA Victim 1 invested $25,000 through Person C, in June of 2020, for the purpose of LUX buying cars for their surface lot. WBCA Victim 1 only held this investment for approximately a year because he/she was not a fan of the used-car dealership model. During this time, Person C introduced WBCA Victim 1 to LINGAN.

23. According to WBCA Victim 1, he/she also invested into a cryptocurrency opportunity he learned about from LINGAN in 2020. WBCA Victim 1 invested approximately $50,000 into SR Private Equity. Your affiant believes SR Private Equity (SR) stands for "Sath Rath Equity". [1] After a few months of not receiving reports from SR, WBCA Victim 1 wanted to withdraw his/her funds from SR. Instead of receiving this money back, LINGAN and Person C convinced WBCA Victim 1 to roll the funds into WBCA.

24. According to WBCA Victim 1, he/she learned about WBCA from Person C. WBCA needed investors to provide short-term lending through promissory notes to provide cash flow to WBCA. WBCA needed cash up-front to take advantage of opportunities to purchase vehicles. WBCA is a wholesaler and was selling the vehicles to dealerships and companies. WBCA Victim 1's first investment was in May 2021 for $100,000.

25. According to WBCA Victim 1, throughout his/her investment with WBCA interest returns declined. This was due to the increased amount of time it took for titles to transfer between the buyer and seller.

26. WBCA Victim 1 provided your affiant and other investigators with a spreadsheet of WBCA deals spanning from July 4, 2022, through May 17, 2023, containing hundreds of cars that WBCA bought and sold at a profit. WBCA Victim 1 received this spreadsheet in an email from Person C in June 2023. Person C has told IRS-CI that the information on the spreadsheet was provided by LINGAN. The spreadsheet represents that all the vehicles were purportedly sold to one of three places: Give Me The VIN (GMTVIN), Auto Buy, and United Auto. The "vendor" column on the spreadsheet says "LUX Auction" or "LUX AUTO DEPOT Auction". The "deal type" column referenced "wrecked" or "exotic". In total the spreadsheet represents WBCA bought $16,909,450 worth of vehicles and sold them for $20,870,850 for a $3,961,400 profit.

27. According to the spreadsheet, $10,930,150 of the vehicles sold by WBCA referenced above were sold to GMTVIN. On September 19, 2024, John Wolfe (Wolfe) owner of GMTVIN was interviewed by IRS-CI. According to Wolfe, GMTVIN rarely buys salvaged vehicles, and their buyers are not instructed to seek out wrecked cars. According to Wolfe, GMTVIN would never knowingly buy a wrecked / salvaged car – they would rather pay more for car that are ready to

---

[1] On November 18, 2022, Rathnakishore Giri (Rath) was arrested on criminal charges for his involvement in a cryptocurrency investment fraud scheme that raised at least $10M from investors. On October 4, 2024 Giri plead guilty to at least one charge related to the investment fraud scheme. One of the entities that Giri used to orchestrate this fraud was SR Private Equity (SR).

go and sell quickly. GMTVIN has very little business in Columbus, OH. Wolfe did not recognize the names SATHTHIA LINGAN, [redacted] or Person C's true name. GMTVIN looked up the following vehicles from the spreadsheet, within their sales system to see if they had any records related to them:

| Condition | Make and Model | Lot # (Last 6 of VIN) | Status at GMTVIN |
|-----------|----------------|----------------------|------------------|
| Wrecked | GMC Yukon | x264194 | No records |
| Wrecked | Land Rover Range Rover | x839548 | No records |
| Wrecked | Mercedes Benz GLE | x492009 | No records |
| Wrecked | Land Rover Range Rover | x238662 | No records |
| Wrecked | Ford Expedition | xA55679 | No records |
| Wrecked | Toyota Tundra | x732740 | No records |
| Wrecked | Mitsubishi Eclipse | x984554 | No records |

28. GMTVIN looked up the following entities, which are known entities in LINGAN's money laundering network, within their sales system to determine if they had done any business with the entities. The following was provided by Wolfe:

| Entity | GMTVIN Status |
|--------|---------------|
| WE BUY CARS AMERICA | No Records |
| LUX AUTO | 5 vehicles purchased from LUX AUTO |
| MAXXVIN | 3 vehicles purchased from MAXXVIN |
| STAR WHOLESALE | No Records |
| ULTIMATE WHOLESALE | No Records |
| OXFORD MOTORS | 1 vehicle sold to OXFORD MOTORS |
| MIDWESTERN WHOLESALE | No Records |
| ALPERTA FINANCIAL | No Records |

29. According to bank statements, WBCA Victim 1 wired $1,749,813.20 to WBCA Fifth Third account ending in x0713 between May 18, 2021, and July 7, 2023.

**WBCA Victim 2**

30. WBCA Victim 2 was interviewed by IRS-CI. According to WBCA Victim 2, they heard about WBCA from a friend who went to the same church as Person C. WBCA Victim 2 was interested in the opportunity and the mutual friend introduced WBCA Victim 2 to Person C. Person C told WBCA Victim 2 that WBCA was a cash-based wholesale / bulk buyer of vehicles. Person C said that WBCA does not buy wholesale packages until they have a pre-arranged sale lined up, and that WBCA was the ultimate middleman company. WBCA bought from leasing companies like Hertz and sold to large dealerships in Central Ohio and Kentucky. WBCA pooled funds from investors to purchase the large amounts of vehicles. LINGAN was a partner with WBCA that was responsible for buying and selling vehicles.

31. According to WBCA Victim 2, he/she began investing in WBCA around March of 2022. WBCA Victim 2 spoke to other investors prior to investing. WBCA Victim 2 felt security in the investment because even if the car market dipped there were still vehicles owned by WBCA as

collateral. WBCA Victim 2 received lists of VINs that WBCA purportedly purchased from Person C.

32. WBCA Victim 2 provided investigators a list of hundreds of VINs that made up the collateral for WBCA that he/she believes was handed to him/her by Person C in person sometime in 2023 or 2024. The first four vehicles on this list were:

| Year | MakeModel | Last 6 digits of VIN |
|------|-----------|----------------------|
| 2014 | Land Rover Range Rover Autobiography | 150925 |
| 2019 | GMC Yukon Denali | 353591 |
| 2016 | Tesla Model X | 021127 |
| 2020 | Infiniti QX60 Luxe | 538325 |

33. These four vehicles were also a part of WBCA Victim 1's spreadsheet referenced above in paragraphs 26 and 27 of this affidavit. According to that spreadsheet, these four vehicles had deal dates in September 2022 and were each sold at a profit to GMTVIN.

34. Your affiant compared these four vehicles listed above to the nine total vehicles that GMTVIN sold to or bought from LINGAN-controlled entities (see paragraph 28). None of the four vehicles listed above were part of those nine GMTVIN-LINGAN deals.

35. According to WBCA Victim 2, monthly returns paid by WBCA decreased during the life of the investment. This was due to the amount of time for titles to transfer and instances when the buyer WBCA was selling to backed out of the deal.

36. According to bank statements, WBCA Victim 2 invested $1,880,000 via six checks that were deposited into WBCA Fifth Third Bank account ending in x0713 and Fifth Third Bank account ending in x2553 between May 18, 2021, and July 7, 2023.

37. WBCA Victim 2 learned in April of 2025 that WBCA was no longer making payments to investors and investors were no longer able to accumulate interest. Person C told WBCA Victim 2 that this was due to a giant batch of cars from Hertz that WBCA was going to take a loss on if they liquidated.

38. WBCA Victim 2 also pursued separate investment opportunity through LINGAN. WBCA Victim 2 provided funding for LINGAN's exotic rental company LA STALLA EXOTICS, so LINGAN could purchase exotic vehicles and rent them in Miami, Florida. WBCA Victim 2 also purchased vehicles himself/herself and shipped them to LA STALLA EXOTICS in Miami, Florida. WBCA Victim 2 explained vehicles at LA STALLA EXOTICS were to be rented for up to 60 days, and WBCA Victim 2 split profits with LINGAN. If a vehicle did not rent well, WBCA Victim 2 knew the vehicle could be sold to recuperate the investment.

39. According to WBCA Victim 2, LINGAN provided WBCA Victim 2 with promissory notes related to exotic vehicles WBCA Victim 2 believed he/she was providing funding for LA STALLA EXOTICS' fleet. WBCA Victim 2 believed he/she provided funding for seven vehicles. WBCA Victim 2 wired money to ULTIMATE WHOLESALE, STRADA EXOTICS, and

WBCA. LINGAN was then supposed to send the money to whom he was purchasing the exotic vehicle from.

40. According to WBCA Victim 2, he/she provided at least $1,109,778 via wires or direct transfers to LINGAN-controlled entities related to the purchase of vehicles for LA STALLA EXOTICS' fleet.

41. According to WBCA Victim 2, as of September 26, 2025, WBCA Victim 2 learned that he was scammed by LINGAN. LINGAN's criminal defense counsel told WBCA Victim 2 to stop communicating with LINGAN. WBCA Victim 2 learned that the vehicles he/she believed were being bought for LA STALLA EXOTICS were never purchased by or titled to LINGAN. LINGAN was providing the vehicles that WBCA Victim 2 sent to LA STALLA EXOTICS to other victims as a way to lull them.

**WBCA Victim 3**

42. WBCA Victim 3 was interviewed by IRS-CI. According to WBCA Victim 3, he/she knew Person C for years through the church prior to getting involved into a business relationship in 2020. Person C told WBCA Victim 3 that LINGAN and ▓▓▓▓▓▓▓▓▓▓▓▓ were impressive and intelligent but needed more structure. WBCA Victim 3 originally invested into LUX through Person C to help get the dealership off the ground.

43. According to WBCA Victim 3, he/she also invested $250,000 with SR Private Equity. As of June 12, 2025, WBCA Victim 3, did not know about the issues with SR Private Equity noted above in footnote 1 of this affidavit.

44. According to WBCA Victim 3, WBCA pooled money from investors to pursue wholesale opportunities in the auto industry. WBCA sourced vehicles from auctions, dealerships, public sales, rental companies, and wrecked cars. Profits were split 50% to the lenders and 50% to Person C and LINGAN.

45. According to WBCA Victim 3, there were consistent issues with WBCA paying returns. Specifically, there was a problem with a large batch of vehicles WBCA bought from Hertz or another rental company. WBCA had issues transferring the titles and they were sitting on this large lot of cars that they couldn't sell.

46. According to bank records, WBCA Victim 3 invested $1,672,000 via checks and wires that were deposited into WBCA Fifth Third Bank account ending in x0713.

47. WBCA Victim 3 also pursued a separate investment opportunity through ▓▓▓▓▓▓▓▓▓▓▓▓ related to exotic vehicles. WBCA Victim 3 purchased exotic vehicles for the purpose of either being rented or to be flipped at a profit. According to bank records, the money WBCA Victim 3 provided to ▓▓▓▓▓▓▓▓▓▓▓▓ was not used to purchase the vehicles it was supposed to.

48. According to WBCA Victim 3, [ ] provided WBCA Victim 3 with promissory notes and bills of sales related to the exotic vehicles WBCA Victim 3 believed he/she was providing funding for. WBCA Victim 3 wired money to an entity controlled by [ ] called AMERICAN ASSET GROUP, as well as LUX. [ ] was then supposed to send the money to whom he was purchasing the exotic vehicle from.

49. Your affiant believes that the promissory notes and bills of sale provided to WBCA Victim 3 were fraudulent based upon review of bank records, VIN research, and title / registration history related to these vehicles.

50. According to WBCA Victim 3, [ ] provided him/her with excuses of why he could not send WBCA Victim 3 any money/returns and why he could not provide titles for the vehicles.

51. According to WBCA Victim 3, [ ] sent a Ford GT he/she purchased to his/her residence, but [ ] could not provide the title. Since June 12, 2025, a repossession truck showed up to WBCA Victim 3's residence to take the Ford GT. WBCA Victim 3 learned that the Ford GT was being leased by LINGAN's significant other from a car dealership in Miami, and that the dealership was the true owner of the Ford GT.

52. According to WBCA Victim 3, he/she invested $2,091,482.71 in the purchase of exotic vehicles through [ ]

**Ohio Victim 1 and 2**

53. Ohio Victims 1 and 2 were interviewed by IRS-CI. Ohio Victims 1 and 2 are investment partners located in the Columbus, OH area. Ohio Victim 1 and Ohio Victim 2 run separate, successful businesses in the area: a large-scale home service business and a real estate / property management company.

54. According to Ohio Victim 1, he/she met [ ] through their landlord-tenant relationship for a property located in Powell, OH. At the time, [ ] was working toward establishing his automotive dealership, LUX. Over time, Ohio Victim 1 came to trust [ ] and developed a mentor-mentee relationship with him.

55. According to Ohio Victim 1, through OH Entity 1, Ohio Victims 1 and 2 became lenders for [ ] and LUX. After receiving contributions from Ohio Victims 1 and 2, OH Entity 1 forwarded the funds onto LUX. With OH Entity 1's funds, LUX was able to purchase used vehicles for the dealership's lot.

56. According to Ohio Victim 1, per the terms of their loan, [ ] / LUX paid OH Entity 1 monthly interest and periodic shared profits while continuously putting the principal to work by keeping LUX's inventory full. During this part of their financial relationship, Ohio Victims 1 and 2 did not know which cars were being bought and sold using OH Entity 1's funds.

57. According to Ohio Victim 1, upon receipt of funds from OH Entity 1, LUX used them to purchase vehicles for the lot. Ohio Victim 1 estimates the line of credit reached $1,000,000 at its peak. At this amount, OH Entity 1 received approximately $20,000 monthly payments and the additional profits were provided every 6 to 12 months. From there, OH Entity 1 earnings were split 50-50 between Ohio Victim 1 and Ohio Victim 2.

58. According to Ohio Victim 1, beginning around the start 2022, _____ and LINGAN pitched Ohio Victims 1 and 2 on wholesale buying and selling exotic vehicles. _____ and LINGAN had connections in Florida to both purchase these vehicles at a discount and pre-arrange buyers on the back end, which created less risk that the deals would make a profit. In order to maximize profits and complete the deals as quickly as possible, LINGAN and _____ needed Ohio Victims 1 and 2's cash to finance the deal. For these wholesale deals, specific inventory was tied to particular rounds of financing.

59. According to Ohio Victim 1, in total, an entire deal was supposed to take approximately 1 to 5 months and could produce up to 20% returns. From there, the profits were to be split 30% to each Ohio Victim 1, Ohio Victim 2, and LINGAN and 10% to _____ As soon as one deal package was sold, _____ and LINGAN had the next deal lined up and would often leverage profits from one deal and use them in the next deal.

60. According to Ohio Victim 1, throughout the course of their deals, _____ and LINGAN appeared to be "flush with money" and having "family money", so Ohio Victim 1 thought all was well despite not knowing the day-to-day business activity at LUX.

61. According to Ohio Victim 1, he/she, Ohio Victim 2, and LINGAN were pooling millions of dollars to provide to _____ / LUX for the purchase of these exotic vehicles.

62. According to Ohio Victim 1, they would sometimes receive VIN details related to these purchases / sales, but most of the deal information was maintained by LINGAN and _____.

63. Your affiant believes that the deal information provided to Ohio Victim 1 was fraudulent based upon review of bank records, VIN research, and title / registration history related to these vehicles.

64. According to Ohio Victim 1, through 2023, he/she believed everyone involved was making a ton of money based upon the bank statements that showed the profits earned. Ohio Victim 1 believed that LINGAN was sending money directly to _____ / LUX because LINGAN's funds were not funneled through OH Entity 1 like Ohio Victim 1 and 2.

65. Analysis of LUX bank records show that after receiving OH Entity 1 funds, LUX conducted transactions to keep LINGAN's Ponzi scheme alive by using the funds to pay back other investors.

66. According to bank records, on October 20, 2023, OH Entity 1 wired $2,081,000 to LUX WesBanco account ending in x9839 for the purchase of 33 Escalades and 3 Ford Raptors. Per the wholesale purchase order provided to OH Entity 1, the seller of the vehicles was Swift

Wholesale located in Orlando, FL. To support this transaction, LUX produced documentation of a wire request from LUX WesBanco x9839 to Swift Wholesale for $2,026,025 that was initiated October 11, 2023. However, according to bank records, LUX conducted no such transaction with Swift Wholesale in October 2023.

67. According to bank records, following the receipt of the $2,081,000 LUX WesBanco x9839 conducted, among others, the following transactions:

    a. $200.000 to AMERICAN ASSET GROUP – an entity controlled by ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ and used by LINGAN to defraud other investors.

    b. $266,988.38 to Kauri Enterprises – an entity of California investors defrauded by ▓▓▓▓▓▓▓▓▓ and LINGAN.

    c. $805,000 to Carrio Motorcars – a dealership which is not related to Swift Wholesale.

    d. Greater than $700,000 to other LUX accounts. From these LUX accounts, your affiant has identified at least $100,000 which is paid to other Ponzi scheme victims.

68. According to bank records, on March 15, 2024, Ohio Victim 2 wired a total of $5,395,100 to LUX Fifth Third Bank account ending in x5695. According to Ohio Victim 2, this was for the purchase of more than 20 exotic vehicles with the expectation of making nearly $1,000,000 in profit.

69. According to bank records, instead of sending the funds to the alleged seller, LUX Fifth Third Bank x5695 wired the entire amount to ULTIMATE WHOLESALE LLC (ULTIMATE) Fifth Third Bank account ending in x3020, another LINGAN-controlled entity primarily used to defraud Florida Victims 1 and 2.[2]

70. According to bank records, ULTIMATE Fifth Third Bank x3020 conducted, among others, the following transactions within 48 hours of receipt:

    a. $925,000 to a New Jersey Victim (not referenced in affidavit)

    b. $15,000 to LINGAN who used the funds to pay off a settlement with an Ohio Victim (not referenced)

    c. $245,250 to BKB PRODUCTIONS LLC, an entity controlled by LINGAN and opened in the name of his significant other

    d. $33,969.29 to WBCA Victim 2

    e. $17,500 to co-conspirators.

    f. Greater than $1,000,000 to other LUX accounts. From these LUX accounts, your affiant has identified at least $40,000 which is paid to other Ponzi scheme victims. Included within these payments using Ohio Victim 2's funds is a Ponzi-style payment to his/her partner, Ohio Victim 1.

---

[2] When Florida Victims 1 and 2 invested with LINGAN and received payments related to their investments, they interacted primarily with ULTIMATE accounts.

71. According to Ohio Victim 1, he/she believed that the "profits" sent back to OH Entity 1 were a result of LUX flipping the exotic vehicles. However, according to bank records, many of the payments back to OH Entity 1 were from other entities used within LINGAN's Ponzi scheme and were not the result of legitimate sales.

72. During LINGAN and [REDACTED] fraud against Ohio Victims 1 and 2, statements at Fifth Third Bank, where OH Entity 1 held its account, did not show the counterparties on incoming wires. For instance, Ohio Victim 1 had never heard of the entity RIDES2CASH, another LINGAN controlled entity, despite receiving over $1.6M in wires between April and September 2021. It was not until he/she was shown the internal bank records with wire details by IRS-CI that Ohio Victim 1 knew that some of OH Entity 1's profits were received from entities other than LUX.

73. According to Ohio Victim 1, beginning around early 2024, they were not receiving regular return payments on the wholesale deals they funded for [REDACTED] and LINGAN. LINGAN – along with Ohio Victim 1 – regularly called [REDACTED] to question why their payments were delayed. [REDACTED] always provided answers to their questions and Ohio Victim 1, who is not in the car industry, thought the reasons were good enough, so he/she continued to invest and/or believe that his/her loan was safe.

74. According to Ohio Victim 1, throughout the periods in which they were not receiving payments, Ohio Victims 1 and 2 believed it was due to issues with funding at the auto auction. [REDACTED] had told them that he was going to sell the cars at an auto auction because the original buyer had fallen through. In order to give them a false sense of security, [REDACTED] provided Ohio Victims 1 and 2 spreadsheets of vehicles that were currently at the auction and were awaiting being sold. Further, LINGAN told Ohio Victims 1 and 2 that he would leverage his existing exotic vehicle rental business to put these assets to work and earn Ohio Victims 1 and 2 money while the wholesale deals were being held up.

75. According to Ohio Victim 1 and bank records reviewed by your affiant, outside of the pooled investments through OH Entity 1, Ohio Victim 1 and Ohio Victim 2 individually financed the following fraudulent deals:

    a.  Ohio Victim 1

        i.  1990 Lamborghini Countach for $1,000,000 in February 2024

            1.  The "seller" of this Countach was allegedly Carrio Motorcars. However, after receipt of the $1,000,000 at ULTIMATE Fifth Third x3020, over $1,000,000 was sent out to counterparties unrelated to Carrio Motorcars including $933,000 that was sent to a New Jersey Victim (not referenced in affidavit) in a Ponzi-style payment.

        ii.  2020 Bugatti Chiron for $2,535,000 in December 2024

            1.  The "buyer" of this Chiron was a different New Jersey Victim (not referenced in affidavit) and DE Entity 1. Per supporting documentation provided by this New Jersey Victim, he/she stopped providing capital to LINGAN in October 2024. Further, this New

           Jersey Victim 1 did not sign the agreement put forth as
           documentation of the sales agreement to induce Ohio Victim 1.

    iii.   Seven Watches for $1,217,500 in January 2025
        1.   Upon receipt of the $1,217,500, ULTIMATE transferred the funds
            from PNC account x6763 to ULTIMATE PNC account x6747.
            From PNC account x6747, ULTIMATE sent over $1,000,000 to
            other victims in Ponzi-style payments.

    iv.   2019 McLaren Senna, Rolls Royce Spectre, and two Rolls Royce
        Cullinans for $1,353,000 in May 2025
        1.   Upon receipt of the $1,353,000, ULTIMATE transferred the funds
            from PNC account x6763 to ULTIMATE PNC account x6747.
            From PNC account x6747, ULTIMATE sent over $700,000 to
            ALPERTA FINANCIAL – the entity and account used to defraud
            Virginia Victims (see below).

  b.  Ohio Victim 2
    i.   Wholesale deal involving over 20 exotic vehicles for $5,395,100 on March
        15, 2024 (see paragraphs 68-70 above)

76. Ohio Victim 1 estimated he contributed over $10,000,000 toward OH Entity 1 and the individual deals. Ohio Victim 2 estimated he contributed over $11,000,000 to OH Entity 1 and the individual deal.

77. In total, Ohio Victim 1 and 2 have contributed greater than $21,000,000 toward materially misrepresented and patently fraudulent investment opportunities orchestrated by ▮▮▮▮▮▮▮▮▮▮▮ and LINGAN. According to Ohio Victims 1 and 2, they have collectively been paid back approximately $11,000,000, resulting in an approximate loss amount of $10,000,000.

**Ohio Victim 3**

78. Ohio Victim 3 was interviewed by IRS-CI. According to Ohio Victim 3, Ohio Victim 3 knew LINGAN for years prior to investing with ▮▮▮▮▮▮▮▮▮▮▮▮ in 2024. LINGAN vouched for ▮▮▮▮▮▮▮▮▮ Ohio Victim 3 was investing with ▮▮▮▮▮▮▮▮▮▮▮ through AMERICAN ASSET GROUP. Ohio Victim 3 believed his/her investment was being used to purchase exotic vehicles.

79. According to Ohio Victim 3, Ohio Victim 3 invested approximately $6M with ▮▮▮▮▮▮▮▮▮▮▮▮ and only received approximately $3M in returns. Ohio Victim 3 estimates his/her loss amount at approximately $3M.

80. ▮▮▮▮▮▮▮▮▮▮▮ provided Ohio Victim 3 with promissory notes, bill of sales, and titles related to the exotic vehicles Ohio Victim 3 believed his/her investment was being used to purchase.

81. Your affiant believes that the promissory notes and bills of sale provided to WBCA Victim 3 were fraudulent based upon review of bank records, VIN research, and title / registration history related to these vehicles.

82. According to Ohio Victim 3, once Ohio Victim 3 began to have issues receiving payment related to his/her investment, LINGAN became more involved. ▮▮▮▮▮▮▮▮▮▮ LINGAN, and other co-conspirators impersonated individuals involved with Ohio Victim 3 deals on phone calls with Ohio Victim 1. ▮▮▮▮▮▮▮▮▮▮ LINGAN, and other co-conspirators used an email address with the domain "@manheimcollect.com" to represent themselves as a part of Manheim. Manheim is in fact a company offering auto auctions. ▮▮▮▮▮▮▮▮▮▮ LINGAN, or other co-conspirators used this email address to communicate with Ohio Victim 3 regarding the status of payment related to the deals Ohio Victim 3's investment went towards.

83. According to Ohio Victim 3, he/she talked with an individual at Manheim who informed him "@manheimcollect.com" was not associated with Manheim and that Ohio Victim 3 was not communicating with legitimate Manheim employees. Investigators also contacted Cox Automotive, parent company for Manheim, and the domain "@manheimcollect.com" is not associated with Cox or Manheim.

## Florida Victims 1 and 2

84. Florida Victims 1 and 2 were interviewed by IRS-CI. According to Florida Victims 1 and 2, they were introduced to LINGAN in 2021, through their mutual friend, Person A. Together with Person A, Florida Victims 1 and 2, and LINGAN started a retail dealership in Florida, Florida Entity 1. LINGAN was the buyer for Florida Entity 1. Florida Entity 1 struggled and had problems getting proper title to their customers. Florida Entity 1 effectively closed shortly thereafter.

85. According to Florida Victims 1 and 2, later in 2021, LINGAN pitched Florida Victims 1 and 2 on wholesaling vehicles where LINGAN would buy vehicles in bulk and flip them for a profit within 6 to 8 weeks. LINGAN, with end buyers lined up, could use Florida Victims 1 and 2's funds to purchase cars below market and immediately sell at a profit – creating an arbitrage opportunity.

86. According to Florida Victims 1 and 2, the wholesale business grew and Florida Victim 1 established Florida Entities 2 and 3 to handle the investment into ULTIMATE. Per Florida Division of Corporation records, LINGAN and Florida Victim 1 were the entity managers of ULTIMATE at origination on January 6, 2022. LINGAN and Florida Victim 1 continued to be entity managers until August 21, 2024, when LINGAN became the sole manager.

87. Under their agreement, Florida Victims 1 and 2 loaned LINGAN the money to purchase the exotic vehicles which, in turn, became the collateral for their loans. The flow of funds went from Florida Victims 1 and 2 to Florida Entities 2 and 3 and then to ULTIMATE bank accounts.

Despite being a manager for ULTIMATE, Florida Victim 1 was not an authorized signer on ULTIMATE accounts and was blind to the activity within the account.

88. According to Florida Victims 1 and 2, throughout late 2021 and into early 2022, LINGAN paid them out on the planned schedule of 6 to 7 weeks after investing at 10-12% per deal. Beginning in 2023, the typical 6-to-7-week payment cycle turned into 10, 15, or 20 weeks. By 2024, no more payments were coming back to Florida Victims 1 and 2. LINGAN provided excuses about end buyers not providing the funding or backing out of deals.

89. According to Florida Victims 1 and 2, due to end buyers not paying, Florida Victims 1 and 2 wanted to liquidate their exotic vehicle collateral through Manheim Auction and get the proceeds immediately. Even though doing so would limit the sales price, Florida Victims 1 and 2 preferred a reduced return over waiting for the buyers that were not paying. During an in-person meeting where they reviewed a list of every car included in their collateral, LINGAN provided the location of each car to Florida Victims 1 and 2. According to Florida Victims 1 and 2, LINGAN told them the significant majority of Florida Victims 1 and 2's cars were moved to Manheim Auction, but buyers at those auctions were also not paying and were delaying LINGAN's payments to Florida Victims 1 and 2.

   a. According to the attorney for Florida Victims 1 and 2, he researched the vehicles / collateral and determined that they were not being held or auctioned at the locations provided by LINGAN because they did not exist within Manheim's internal system.

90. Ohio Victim 3 provided investigators with a copy of an email between LINGAN and an individual who worked at Huntington Bank (Huntington Bank Employee) from April 24, 2025 that was forwarded to Florida Victim 1. Within this message, Huntington Bank Employee was telling LINGAN that payments to the ULTIMATE account ending in x5392 were scheduled to clear April 29, 2025, and that the balance associated with the account was $2,461,530.49.

91. Your affiant and other investigators interviewed Huntington Bank Employee on May 6, 2025. Huntington Bank Employee left Huntington Bank in August 2024 and no longer uses or has access to the Huntington email account. The Huntington Bank Employee used to handle the LUX account when he/she did work at Huntington Bank.

92. Bank records for ULTIMATE Huntington account x5392 show that the account was closed in October 2024.

93. Your affiant believes that LINGAN or someone under his control sent this e-mail to Florida Victim 1 with the following misrepresentations: (1) Huntington Bank Employee could not have sent the e-mail on April 24, 2025 because they had not worked at Huntington Bank since August 2024 and (2) the amount of $2,461,530.49 could not have been the expected balance for ULTIMATE x5392 on April 29, 2025 because the account was closed October 2024.

94. According to Florida Victims 1 and 2, in a separate investment opportunity, LINGAN pitched Florida Victims 1 and 2 on buying a fleet of Lincoln Navigators from LUX and renting them to a

customer who had previously been arranged. LINGAN provided purchase orders to Florida Victims 1 and 2 signed by an employee at LUX. LINGAN provided updates that the renter was in default and had to sell the contract to a third-party entity in South Carolina, South Carolina Entity 1.

95. According to Florida Victims 1 and 2, after continued non-payment, LINGAN told them that LINGAN's attorney wrote a demand letter requesting payment to South Carolina Entity 1. However, no payment was received by LINGAN, ULTIMATE, nor Florida Victims 1 and 2 in response.

96. According to Florida Victims 1 and 2, when Florida Victims 1 and 2's attorney contacted South Carolina Entity 1, they had never heard of ULTIMATE, LINGAN, nor the agreement which Florida Victims 1 and 2 were relying upon when attempting to collect the funds.

97. According to Florida Victims 1 and 2, whether personally or through Florida Entities 2 and 3, they estimated that they have invested over $13,000,000 with LINGAN and are owed that amount.

**New Jersey Victim 1**

98. New Jersey Victim 1 was interviewed by IRS-CI. According to New Jersey Victim 1, LINGAN's pitch was he was able to buy exotic cars at a discount because the vehicles were either repossessed, defaulted on, or were coming off lease agreement. LINGAN would then find an end-buyer for the vehicles before New Jersey Victim 1 provided the funds. The profit on each deal/vehicle was pre-determined prior to New Jersey Victim 1 providing any money. New Jersey Victim 1 started investing with LINGAN in early 2024.

99. According to New Jersey Victim 1, he/she was provided purchase orders between his/her entity and LINGAN's entity ULTIMATE (same ULTIMATE referenced in Florida Victims 1 and 2 section). According to New Jersey Victim 1, LINGAN was responsible for communicating with the entities that were purchasing the vehicles New Jersey Victim 1's investment was going toward.

100. According to New Jersey Victim 1, originally, he/she would get all the of the principal amount back plus the interest gain before providing further investments. In or around July 2024, New Jersey Victim 1 started authorizing LINGAN to reinvest his funds instead of receiving payment.

101. According to New Jersey Victim 1, LINGAN stopped paying returns in or around July or August 2024. LINGAN told New Jersey Victim 1 that the end buyers were not sending funds for the vehicles purchased with New Jersey Victim 1's money. Even with this deal on hold, New Jersey Victim 1 continued to invest more in August and September 2024.

102. According to New Jersey Victim 1, after months of non-payment, New Jersey Victim 1 wanted LINGAN to back out of the existing deals with the initial buyers and move the cars to Manheim to be sold at auction. LINGAN agreed and LINGAN sat down with New Jersey Victim

1 and went through the location of 63 vehicles that New Jersey Victim 1 funded and which Manheim location LINGAN was sending each vehicle to. The 63-vehicle spreadsheet included VIN, mileage, storage location, Manheim destination, and auction dates. LINGAN shared the results of each deal. After the auctions purportedly ended, LINGAN came up with excuses for why Manheim was not releasing the funds.

103. According to New Jersey Victim 1, after an extended period of non-payment, New Jersey Victim 1 asked LINGAN for his Manheim representative's contact information. LINGAN provided information for a purported Manheim representative named "Christina" to New Jersey Victim 1. New Jersey Victim 1 spoke to Christina about the issues but was then passed to a "Bobby". New Jersey Victim 1 spoke to and texted Bobby about updates on the 63 cars. New Jersey Victim 1 also spoke to "Toni" with Central Florida Manheim who told New Jersey Victim 1 that the bank account number Manheim had was wrong and there were issues with LINGAN's Manheim account. Toni passed New Jersey Victim 1 to "Jason in Finance". New Jersey Victim 1 went through each vehicle with Jason and asked when he/she could expect payment.

104. According to New Jersey Victim 1, he/she moved to have his/her attorneys sue Manheim over all these delays. New Jersey Victim 1's attorneys wrote a demand letter to Manheim and included the contact information of each individual from Manheim that New Jersey Victim 1 spoke to. The letter was sent to the true Manheim business. The true Manheim business responded to the demand letter saying none of the employees New Jersey Victim 1 spoke to actually worked for Manheim, none of the phone numbers were associated with Manheim employees, and none of the 63 vehicles were in Manheim's system.

105. According to New Jersey Victim 1, he/she is owed $15M from LINGAN for the deals that occurred after July 2024. New Jersey Victim 1 has been instructed to no longer contact LINGAN, and to contact his criminal defense attorney.

**Virginia Victims**

106. Virginia Victim 1 was interviewed by IRS-CI. According to Virginia Victim 1, LINGAN pitched an exotic vehicle investment in or around October 2024. The opportunities were arranged by LINGAN where he had a buyer for a vehicle at a higher price than what he could acquire it for. LINGAN just needed Virginia Victim 1 to provide the funding to buy the car at the discount.

107. According to Virginia Victim 1, LINGAN provided them with promissory notes with promised returns related to a specific vehicle (VIN included) sale.

108. According to Virginia Victim 1, he/she did two of these deals that were successful. Virginia Victim 1 is part of a capital group, and other members became interested in LINGAN's deals. Multiple members of the capital group ended up investing with LINGAN. Virginia Victim 1 also told friends about the opportunity who eventually ended up investing with LINGAN as well.

109. According to Virginia Victim 1 and other Virginia Victims, LINGAN instructed them to wire their investments to an ALPERTA FINANCIAL bank account.

110. According to Virginia Victim 1, he/she approximates LINGAN owes him/her approximately $1M in principal.

111. Starting in or around spring 2025, LINGAN stopped paying Virginia Victim 1 and other Virginia investors. LINGAN provided Virginia Victim 1 with a vehicle for him/her to drive around. The vehicle was a way for LINGAN to reduce the monthly interest LINGAN owed Virginia Victim 1. According to Virginia Victim 1 the vehicle was a 2021 Rolls Royce Cullinan with a VIN: SLATV4C0MU204623. As recent as October 14, 2025, LINGAN was attempting to retrieve this vehicle from Virginia Victim 1.

112. Virginia Victim 2 was interviewed by IRS-CI. According to Virginia Victim 2, he/she met LINGAN in November 2024 and invested shortly after. The pitch was that LINGAN was able to buy exotic vehicles in bulk (7 to 8 at a time) at a discount and then flip them at a profit. The deals would take 45 to 70 days to flip and for titles to clear.

113. According to Virginia Victim 2, in or around late spring or early summer of 2025, LINGAN started giving excuses of why he could not make payments or why vehicles were not selling. These excuses included title issues at the DMV or brokers not sending LINGAN titles for the cars being purchased. By July 2025, Virginia Victim 2 and most Virginia Victims (they have a group text message chat together) believed that they had been scammed by LINGAN.

114. According to Virginia Victim 2, he/she approximates LINGAN owes him/her approximately $820,000 in principle.

115. According to bank records, ALPERTA FINANCIAL Bank of America account x9667, the account Virginia Victims wired their money, received at least $20.8M from what appears to be investors from November 2024 through May 2025. In the same time frame, ALPERTA FINANCIAL sends money to Ohio Victims 1 and 2, Florida Victims 1 and 2, and at least one other victim not specifically noted in this affidavit.

116. Your affiant interviewed additional Virginia Victims related to their investment with LINGAN. According to these additional Virginia Victims, LINGAN ceased agreed upon interest payments in the summer of 2025. Instead, LINGAN made substitute payments for significantly less than the agreed upon interest payments. According to two of these additional Virginia Victims, LINGAN made reduced payments on August 25, 2025, and October 27, 2025.

**Ohio Victim 4**

117. Ohio Victim 4 was interviewed by IRS-CI. According to Ohio Victim 4, he/she had an agreement with another co-conspirator (Co-conspirator 1) to be the exclusive lender for Co-conspirator 1's rental company. Ohio Victim 4, through his/her entity, provided funding for the purchase of exotic vehicles to be purchased and then rented out by Co-conspirator 1's rental company. As vehicles were purchased, titles were supposed to be put in Co-conspirator 1's company's name, and Ohio Victim 4 was supposed to have first lien.

118. According to Ohio Victim 4, Co-conspirator 1 introduced him/her to LINGAN as a source to purchase exotic vehicles for the rental fleet. LINGAN and Co-conspirator 1 also pitched Ohio Victim 4 that LINGAN could source high-end vehicles at below-market prices and LINGAN had a network of customers interested in long-term rentals. LINGAN represented that he could have customers enter into long-term rental agreements prior to Ohio Victim 4 providing funding for that vehicle. Ohio Victim 4 believed that there was already rental profit lined up associated with vehicles he/she was purchasing. This led to Ohio Victim 4 to provide further funding to Co-conspirator 1's rental company.

119. Your affiant and other investigators reviewed the long-term rental agreements provided to Ohio Victim 4. Your affiant believes all of these long-term rental agreements LINGAN or Co-Conspirator provided to Ohio Victim 4 are fraudulent and were used to induce further investments.

120. According to records provided by Apple Inc., the following are text messages between LINGAN and Co-conspirator 1, as well as text messages from a group chat that included LINGAN, Co-conspirator 1, and Ohio Victim 4 related to a purchase of a Lamborghini Huracan VIN ending in xA16205. Group chat messages are in **bold** (Ohio Victim 4 included) and messages between LINGAN and Co-conspirator 1 are not in bold (Ohio Victim 4 excluded):

| Date and Time | Sender | Message Body |
|---|---|---|
| Tue, 06 Dec 2022 05:29:43(PT) | LINGAN | Let me text him again on Huracan |
| Tue, 06 Dec 2022 05:35:54(PT) | LINGAN | If we did long terms |
| Tue, 06 Dec 2022 05:35:58(PT) | LINGAN | Then we can pay right |
| Tue, 06 Dec 2022 05:36:10(PT) | CO-CONSPIRATOR 1 | Yes |
| Tue, 06 Dec 2022 05:37:02(PT) | LINGAN | I possibly need a favor lol but tell me what I gotta pay / do to get that done<br><br>Floorplans came out and I wrote a check and did that thing like it says hold for fraud etc to check it before it releases |
| Tue, 06 Dec 2022 05:37:46(PT) | LINGAN | Just so the floorplan |
| Tue, 06 Dec 2022 05:37:48(PT) | LINGAN | Doesn't bounce |
| Tue, 06 Dec 2022 05:37:52(PT) | LINGAN | If [Ohio Victim 4] does hook us up |
| **Tue, 06 Dec 2022 08:24:44(PT)** | **Ohio Victim 4** | **Hey Sath any updates on spreadsheet for Dec short term lease options?** |
| Tue, 06 Dec 2022 08:25:16(PT) | LINGAN | Bro |

| Tue, 06 Dec 2022 08:25:19(PT) | LINGAN | Tell him I said to send in |
|---|---|---|
| Tue, 06 Dec 2022 08:25:39(PT) | LINGAN | I already said |
| Tue, 06 Dec 2022 08:25:41(PT) | LINGAN | So I don't look bad |
| Tue, 06 Dec 2022 08:35:16(PT) | CO-CONSPIRATOR 1 | You get sheets done |
| Tue, 06 Dec 2022 08:36:57(PT) | LINGAN | Yes I'm sending |
| Tue, 06 Dec 2022 08:37:01(PT) | LINGAN | Hang tight |
| **Tue, 06 Dec 2022 08:58:11(PT)** | **LINGAN** | **Yes I got the huracan and urus** |
| **Tue, 06 Dec 2022 08:58:16(PT)** | **LINGAN** | **Do you have time to go over the ones guys** |
| Tue, 06 Dec 2022 08:59:27(PT) | LINGAN | You like that? |
| Tue, 06 Dec 2022 08:59:32(PT) | LINGAN | Or drop? Monthly? |
| Tue, 06 Dec 2022 08:59:36(PT) | LINGAN | 3 month not 2 month |
| **Tue, 06 Dec 2022 09:03:24(PT)** | **Ohio Victim 4** | **Can you send huracan and Urus over? If the deals make sense we can make a decision to move forward with those today!** |
| **Tue, 06 Dec 2022 09:03:24(PT)** | **LINGAN** | **And also if there's other ones you guys wanna do I also now have a need for Ferrari gtc4lusso** |
| **Tue, 06 Dec 2022 09:03:25(PT)** | **Ohio Victim 4** | **Thanks Brother!** |
| Tue, 06 Dec 2022 09:10:00(PT) | CO-CONSPIRATOR 1 | Do 3 |
| Tue, 06 Dec 2022 09:11:23(PT) | CO-CONSPIRATOR 1 | Do we have access |
| Tue, 06 Dec 2022 09:14:00(PT) | LINGAN | It's one I sold before |
| Tue, 06 Dec 2022 09:14:02(PT) | LINGAN | Does that make sense |
| Tue, 06 Dec 2022 09:16:25(PT) | LINGAN | Are we working on the back end? |
| **Tue, 06 Dec 2022 09:25:05(PT)** | **LINGAN** | **I added to your sheet! Thank you brothers** |
| **Tue, 06 Dec 2022 09:25:27(PT)** | **Ohio Victim 4** | **Will review shortly!** |

| Tue, 06 Dec 2022 09:25:52(PT) | LINGAN | Tell him he's trying to get it picked up asap one in Vegas and one in Cali |
|---|---|---|
| Tue, 06 Dec 2022 09:25:58(PT) | LINGAN | So we get it today |
| Tue, 06 Dec 2022 09:31:07(PT) | CO-CONSPIRATOR 1 | Is the sheet perfect |
| Tue, 06 Dec 2022 09:31:11(PT) | LINGAN | Look at it |
| Tue, 06 Dec 2022 09:31:13(PT) | LINGAN | I think it is |
| Tue, 06 Dec 2022 09:43:19(PT) | CO-CONSPIRATOR 1 | Email to him |
| Tue, 06 Dec 2022 09:46:49(PT) | LINGAN | Just redid one |
| Tue, 06 Dec 2022 10:59:20(PT) | Ohio Victim 4 | Brothers...I just got hit with another legal blow from my ex (again). I'm mentally checked out the rest of the day sorry guys can re revisit tomorrow morning? |
| Tue, 06 Dec 2022 11:14:16(PT) | LINGAN | Brother. I love you. Relax take time off whatever you need. I am always here to talk to you. We will get through this |
| Tue, 06 Dec 2022 11:14:20(PT) | CO-CONSPIRATOR 1 | Yes sir. Love you brother |
| Tue, 06 Dec 2022 11:14:43(PT) | CO-CONSPIRATOR 1 | You got a family behind you |
| Tue, 06 Dec 2022 11:16:17(PT) | LINGAN | For sure bro we would do anything for you |
| Tue, 06 Dec 2022 11:22:16(PT) | LINGAN | Bro you are a fucking beast. Amazing father. Amazing friend everything!!! |
| Wed, 07 Dec 2022 06:22:18(PT) | LINGAN | Is [Ohio Victim 4] gonna wire today |
| Wed, 07 Dec 2022 06:22:24(PT) | LINGAN | And how much of that do you need |
| Wed, 07 Dec 2022 06:22:32(PT) | CO-CONSPIRATOR 1 | Probably but let's get the huracan done for sure |
| Wed, 07 Dec 2022 06:22:41(PT) | CO-CONSPIRATOR 1 | Not much of it depends on the deals |
| Wed, 07 Dec 2022 06:22:45(PT) | LINGAN | Huracan is my first priority |
| Wed, 07 Dec 2022 09:54:35(PT) | LINGAN | Hey brothers! Did those deals interest you? |

| Wed, 07 Dec 2022 09:57:49(PT) | Ohio Victim 4 | Can you text or email me the vins? |
|---|---|---|
| Wed, 07 Dec 2022 09:58:24(PT) | LINGAN | Yes I also put the vins in the sheets |
| Wed, 07 Dec 2022 09:58:26(PT) | LINGAN | Did you see them |
| Wed, 07 Dec 2022 09:58:45(PT) | Ohio Victim 4 | On it |

Below is a snapshot of the Deal Package Spreadsheet referenced above which was provided by LINGAN to Ohio Victim 4:

| 2021 LAMBORGHINI HURACAN 24,985 miles ZHWUT5ZF3MLA16205 | |
|---|---|
| Wholesale | $265,900 |
| Current MMR | $285,000 |
| Profusion Wholesale Profit | $5,000 |
| Profusion Rental Broker Fee | $2,000 |
| Wholesale Rental | $45,000 |
| Currrent Retail Market Value | $299,995 |
| 3 month retail value | $295,000 |
| 3 month wholesale value +3000 mi | $280,000 |
| Potential Profit Retail | $67,100 |
| ROI 60 DAYS WHOLESALE | $52,100 |

| Thu, 08 Dec 2022 05:16:11(PT) | LINGAN | I'll text him again |
|---|---|---|
| Thu, 08 Dec 2022 05:16:14(PT) | LINGAN | I'm trying with him bro |
| Thu, 08 Dec 2022 05:40:14(PT) | CO-CONSPIRATOR 1 | Okay # is the huracan |
| Thu, 08 Dec 2022 06:59:28(PT) | LINGAN | In chat with [Ohio Victim 4]? |
| Thu, 08 Dec 2022 06:59:35(PT) | LINGAN | Did he send wire for red huracan? |
| Thu, 08 Dec 2022 06:59:46(PT) | LINGAN | I saw he texted |
| Thu, 08 Dec 2022 07:02:59(PT) | CO-CONSPIRATOR 1 | He hasn't wired yet |

| Thu, 08 Dec 2022 09:52:28(PT) | LINGAN | My brothers the red huracan do we want to move on that one? |
|---|---|---|
| Thu, 08 Dec 2022 09:52:29(PT) | LINGAN | I don't want to lose that one |
| Thu, 08 Dec 2022 09:53:33(PT) | Ohio Victim 4 | Yes! |
| Thu, 08 Dec 2022 09:54:14(PT) | Ohio Victim 4 | Can you get [Co-conspirator 1] the info needed to get our process going? |
| Thu, 08 Dec 2022 09:55:22(PT) | LINGAN | Yes I'll send BOS |
| Thu, 08 Dec 2022 09:55:28(PT) | LINGAN | and customer info right now |
| Thu, 08 Dec 2022 09:55:50(PT) | Ohio Victim 4 | When does lease start? |
| Thu, 08 Dec 2022 10:02:12(PT) | LINGAN | Call me |
| Thu, 08 Dec 2022 10:36:42(PT) | CO-CONSPIRATOR 1 | Can we get this done asap |
| Thu, 08 Dec 2022 10:36:48(PT) | CO-CONSPIRATOR 1 | [Ohio Victim 4] wants tracking info |
| Thu, 08 Dec 2022 10:36:58(PT) | CO-CONSPIRATOR 1 | How far are we along |
| Thu, 08 Dec 2022 10:38:04(PT) | LINGAN | Yup |
| Thu, 08 Dec 2022 10:38:08(PT) | LINGAN | I texted Bailey |
| Thu, 08 Dec 2022 13:39:08(PT) | LINGAN | All good brothers? |
| Thu, 08 Dec 2022 13:39:38(PT) | LINGAN | I'm gonna process wire shortly so it hits him in the am |
| Thu, 08 Dec 2022 13:39:45(PT) | LINGAN | Sorry slammed busy day |
| Thu, 08 Dec 2022 13:39:50(PT) | Ohio Victim 4 | [Co-conspirator 1] we good on our end with insurance and paperwork? |
| Thu, 08 Dec 2022 13:42:04(PT) | CO-CONSPIRATOR 1 | just verified insurance ✅ Good to move |
| Thu, 08 Dec 2022 13:42:33(PT) | Ohio Victim 4 | LFG 🟠 thanks brothers |

121. Your affiant believes the above text messages show LINGAN and Co-Conspirator 1 needed money, so they contacted Ohio Victim 4 with a fabricated opportunity to purchase Lamborghini xA16205. Ohio Victim 4 wired funds for the purchase of Lamborghini xA16205 based upon the deal package spreadsheet LINGAN prepared as well as the fake rental agreement that LINGAN and Co-Conspirator 1 created.

122. According to bank records, on December 8, 2022, Ohio Victim 4 wired Co-conspirator 1 $272,500 referencing "Huracan Evo A16205".

123. According to Ohio BMV records and law enforcement databases, Ohio Victim 4 was not provided a physical title as collateral for Lamborghini xA16205. The vehicle was also not titled to Co-conspirator 1's company.

| Type | Registered Owner | Issuing State | Title / Tag Number | Title / Tag Issue Date | Source |
|------|------------------|---------------|--------------------|------------------------|--------|
| Title | Unrelated Entity | Texas | 05751244231085508 | February 16, 2021 | OH BMV / LE Databases |
| Title | Unknown | Nevada | NV014748679 | April 30, 2022 | Ohio BMV |
| Temporary Registration | Unrelated Individual | Ohio | P670182 | September 15, 2022 | Ohio BMV |
| Temporary Registration | Unrelated Individual | Ohio | Q114000 | November 15, 2022 | Ohio BMV |
| *Funding* | *Ohio Victim 4 wire for Lamborghini x16205* | | | *December 8, 2022* | *Bank Records* |
| Title | Unrelated Entity | New Mexico | 22361PH45250924 | December 27, 2022 | Ohio BMV / LE Databases |

124. According to a Co-conspirator 1's company rental agreements, the following is information from a long-term rental contract for the Lamborghini xA16205:

   i. Renter: Juan Pablo Alcyaga
   ii. Address: 32 SE 2nd Avenue Apt 258, Delray Beach, Florida 33444
   iii. Phone: (561) 250-0487
   iv. How did you hear about us? Sath

   v. Make and Model Rented: 2021 Lamborghini Huracan EVO – A16205
   vi. Rented from December 28th, 2022, to March 28th, 2023
   vii. Rental Rate: $60,000
   viii. Odometer: 26,194

   ix. Contract signed on 01/13/2023, 7:55 AM PST

125. According to records provided by Apple Inc., the following are text messages between Co-conspirator 1 and an employee who worked for Co-conspirator 1:

| Date and Time | Sender | Message Body |
|---------------|--------|--------------|
| Fri, 13 Jan 2023 07:37:47(PT) | Employee | Call this number real quick (561)250-0487 |
| Fri, 13 Jan 2023 07:37:58(PT) | CO-CONSPIRATOR 1 | What for |
| Fri, 13 Jan 2023 07:38:04(PT) | CO-CONSPIRATOR 1 | I'm calling |

| Fri, 13 Jan 2023 07:38:13(PT) | Employee | Long term. Listen to voicemail. Let me know if it checks out |
| Fri, 13 Jan 2023 07:38:34(PT) | CO-CONSPIRATOR 1 | It just hangs up but that's fine |
| Fri, 13 Jan 2023 07:38:40(PT) | Employee | Okay |
| Fri, 13 Jan 2023 07:38:59(PT) | Employee | Just wanted to make sure it didn't have some weird recording at the end. |
| Fri, 13 Jan 2023 07:39:01(PT) | Employee | Thank you |

126. Your affiant believes the above text messages show Co-Conspirator 1 and one of his employees created a fake phone number for the customer listed on the Lamborghini xA16205 rental agreement referenced in paragraph 124 that was provided to Ohio Victim 4.

127. According to bank records, between June 2022 and September 2023, Ohio Victim 4 wired $10,630,297 to Co-conspirator 1 for the alleged purchase of 48 exotic vehicles. LINGAN, _____ or their entities received $2,566,100 from Co-conspirator 1.

128. Funds commonly went to the personal benefit of LINGAN, Co-conspirator 1 and others. For example, on or about March 1, 2023, Ohio Victim 4 through his company sent a wire for $663,000 to Co-conspirator 1's company for the purchase of three Cadillac Escalades and a Rolls Royce Cullinan. Co-conspirator 1 used those funds, in part, to send $275,000 to a business associated with LINGAN and $46,000 to American Express for a payment on Co-conspirator 1's account. He also sent $102,855 back to Ohio Victim 4's company, under the guise of "revenue sharing." The money was not in fact revenue sharing but instead was money that Co-conspirator 1 had invested.

**Non-Investment Fraud – Colorado Victim 1**

129. In the summer of 2021, Colorado Victim 1 found a 2021 Mercedes-Benz AMG-63 (AMG-63) on CarGurus.com and contacted the listed dealership, LUX. Colorado Victim 1 and a salesperson from LUX agreed upon a sale of AMG-63 for $172,283.50. Colorado Victim 1 sent LUX Chase account ending in x6858 the funds over two wires on July 3 and July 6, 2023.

130. Your affiant interviewed Colorado Victim 1 on July 28, 2023. As of July 28, 2023, AMG-63 had not been delivered to Colorado Victim 1. In between wire payments and his/her interview with your affiant, Colorado Victim 1 contacted LUX, _____ and the LINGAN-controlled transport company responsible for transporting AMG-63, SHYPN.

131. According to Colorado Victim 1, SHYPN representatives told Colorado Victim 1 that AMG-63 was stuck in Texas because the transport vehicle broke down. SHYPN representatives directed Colorado Victim 1 to talk to _____ for more information related to AMG-63.

132. According to Colorado Victim 1, Colorado Victim 1 flew from Colorado to Columbus, OH to confront LUX and figure out an alternative shipping arrangement. Colorado Victim 1 offered

to hire his own transport company to take possession of the vehicle and complete the delivery. A LUX employee re-assured Colorado Victim 1 that they were finding more vehicles to transport, and the shipment of AMG-63 would be completed.

133. According to Colorado Victim 1, even after visiting LUX and making full payment, Colorado Victim 1 continued to see AMG-63 listed for sale on CarGurus.com and the LUX website.

134. Your affiant performed VIN research on the AMG-63 which showed the most recent activity was associated with Texas Owner 1. Your affiant interviewed Texas Owner 1 on July 31, 2023, and confirmed that AMG-63 was owned and titled by Texas Owner 1 and the vehicle remained in his/her possession.

135. According to Texas Owner 1, they previously listed AMG-63 for sale on CarGurus.com. A potential buyer, "Sach", reached out to Texas Owner 1 via text from 561-732-8338 and offered to buy AMG-63 for $188,000.

    a. Through phone records and interviews with several victims, your affiant is aware that 561-732-8338 is LINGAN's primary phone number.

136. According to Texas Owner 1, LINGAN convinced Texas Owner 1 to pay the remaining balance of the loan on AMG-63. Once he/she did so, Texas Owner 1 shared a copy of the updated title with LINGAN. LINGAN haggled with Texas Owner 1 for another six weeks over a purchase order, sending the funds, and getting clear title.

137. According to Texas Owner 1, frustrated with the lack of progress, Texas Owner 1 attempted to re-list AMG-63 on CarGurus.com. However, CarGurus.com blocked the re-listing because it was already listed for sale by LUX.

138. Bank records for LUX Chase account x6858 show that after receiving Colorado Victim 1's wires, the funds were used to pay back investors in LINGAN's Ponzi schemes. After LUX Chase x6858 received Colorado Victim 1's $72,000 wire the following transactions took place:

    b. LUX Chase account x6858 sent a $15,000 wire to Lickety Split Investments[3] Fifth Third account x5453 which was in turn used to pay WBCA Victim 1 for his/her LUX quarterly returns covering 4Q 2022, 1Q 2023, and 2Q 2023. Further, Lickety Split Investments Fifth Third account x5453 paid an investor $1,000 for his/her SR Private Equity monthly return.

    c. LUX Chase account x6858 transferred another $35,000 to ▆▆▆▆▆▆▆▆▆▆▆ personal Chase account x3526. From there, the following transactions could not have occurred without Colorado Victim 1's funds:

---

[3] Lickety Split Investments LLC (LSI) is the investment entity formed by Person C in 2020. LSI was established in order to collect lender funds and distribute them to LUX. When earnings were realized at LUX, the funds were distributed back to the lenders through LSI.

    i.    ████████████████ wired $55,000 to LUX Fifth Third account x5695;

    ii.   LUX Fifth Third account x5695 transferred $50,000 to WBCA Fifth Third account x2553; and

    iii.  WBCA Fifth Third account x2553 wired $50,000 to a WBCA Victim (not referenced in this affidavit).

139. Bank records for LUX Chase account x6858 show that after receiving Colorado Victim 1's $100,283.50 wire, a $105,000 wire was sent to a Missouri Dealership that was not associated with Texas Owner 1 or the purchase of AMG-63.

140. With the infusion of Colorado Victim 1's funds – and no obligation to legitimately purchase and pay for AMG-63 – LINGAN and ████████████████ were able to continue to keep each of these Ponzi schemes alive with their investment payments to multiple victims.

## SUMMARY

141. Starting in 2020 and continuing through 2025, LINGAN, ████████████████ and other co-conspirators raised over $50,000,00 in their wire fraud / money laundering conspiracy. Your affiant believes loss amount to victims in this investigation is at least $25,000,000.

142. This affidavit is not exhaustive, as your affiant and other law enforcement officers have identified at least 50 victims in this investigation. Your affiant and other law enforcement officers continue to investigate the total fraud proceeds collected by LINGAN and/or ████████████████ the loss amount related to each victim, and other co-conspirators in this scheme.

## CONCLUSION

143. Based upon my experience and the facts presented in this Affidavit, there is probable cause to believe that between 2020 and the present, in the Southern District of Ohio and elsewhere, **SATHTHIA LINGAN** engaged in a wire fraud conspiracy, in violation of 18 U.S.C. § 1349, and laundered the proceeds, in violation of 18 U.S.C. § 1956(h).

Kyle Borton
_____
Kyle Borton
Special Agent, IRS-CI

Subscribed and sworn to before me

This _____30th_____ day of _____October_____ , __2025__ .


Elizabeth A. Preston Deavers
United States Magistrate Judge